# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

DAVID HOWARD PLOTKIN,

     Plaintiff,

     v.

MONTGOMERY COUNTY
PUBLIC SCHOOLS,

     Defendant.

Civil Action No. TDC-17-0571

## MEMORANDUM OPINION

Plaintiff David Howard Plotkin, who is self-represented, filed suit in this Court under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–82 (2018), against Defendant Montgomery County Public Schools ("MCPS") asserting that from May 5, 2015 to May 5, 2016, his son O.P. did not receive one-on-one math instruction outside the general education classroom, known as "pull-out instruction," as required by O.P.'s Individualized Education Program ("IEP"). Plotkin seeks review of the decision on remand in *Plotkin v. Montgomery County Public Schools*, OAH No.: MSDE-MONT-OT-20-25740 (Jan. 15, 2021) (the "Decision on Remand"), in which an Administrative Law Judge of the Maryland Office of Administrative Hearings denied his IDEA due process claim against MCPS. Pending before the Court are Plotkin's Motion for Judgment on the Administrative Record and MCPS's Cross Motion for Judgment on the Administrative Record. ECF Nos. 67, 68. Having reviewed the submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Plotkin's Motion will be DENIED, and MCPS's Motion will be GRANTED.

**BACKGROUND**

I.    **Factual History**

O.P. is a student with disabilities, specifically high-functioning autism, who was eligible for special education under the IDEA and had an IEP for the 2015–2016 school year during which he was in third grade.  During that school year, O.P. attended Wood Acres Elementary School ("Wood Acres") in Bethesda, Maryland and was taught primarily in a general education classroom. Under O.P.'s 2015–16 IEP (the "IEP"), MCPS was supposed to provide O.P. with 10 hours of pull-out instruction each week, consisting of instruction outside of his regular classroom.  Over the course of the 2015–16 school year, O.P. received 6.5 of those weekly hours for reading instruction, but he did not receive the remaining 3.5 hours, which were supposed to be used for math instruction.

Instead of pull-out math instruction, O.P. received all of his third-grade math instruction in the general education classroom.  O.P.'s teacher, Catherine Kashatus, typically began O.P.'s math class with a mini-lesson and warm-up with the whole class, after which the class was broken up into four groups.  The groups varied from day to day, and placement in a particular group was based on Kashatus's daily assessments of student performance.  The first group worked on basic math skills such as addition and subtraction or, later in the year, multiplication and division.  A second group worked on whatever math concept had been introduced in the mini-lesson.  The third group worked with hands-on manipulatives or played interactive games to reinforce mathematical concepts.  The final group consisted of students who needed individualized support or enrichment. O.P. was "consistently" placed in the individualized instruction group and, according to Kashatus, "needed a lot of support and additional practice in order to develop his conceptual understanding." Joint Record ("J.R.") at 36, ECF No. 57-1.  The instruction provided was at the third-grade level,

2

and O.P. received an overall grade of "proficient" in math at the end of the year. *See* J.R. 138, 144.

Consistent with his IEP, O.P. was given preferred seating at the front of the room for the mini-lesson and then was seated close to Kashatus for the small-group work. Math vocabulary was placed on the wall, he was given additional time for testing and certain other activities, and he was given hands-on manipulatives to help him with his conceptual understanding. O.P. also had a one-to-one paraeducator, Portia Davis, who assisted him in the classroom. Davis was expected to help O.P. with the math lesson as well as with issues of self-regulation and self-control.

At the start of third grade, O.P.'s test score on the math portion of the Measure of Academic Progress ("MAP") state standardized test was 169, placing him at the first-grade level. By the end of the year, his score had increased to 183, placing him somewhere between the first-grade and second-grade levels. His knowledge growth was thus 14.0 points, slightly above the average increase for third graders of 13.0. O.P.'s MAP score at the beginning of the year placed him in the 5th percentile. By the end of the year he was in the 11th percentile.

The MAP score is further broken down into four topic areas: (1) number and operations, (2) measurement and data, (3) operations and algebraic thinking, and (4) geometry. O.P.'s most significant improvement was in number and operations, in which his MAP score increased from 165 to 191, for an increase of 26.0, which took him from between the kindergarten and first-grade levels to between the first- and second-grade levels. In measurement and data, his score went from 175 to 182, for an increase of 7.0, with both scores placing O.P. between the first- and second-grade levels. In operations and algebraic thinking, O.P.'s score over the course of the year went from 159 to 173, for an increase of 14.0, with both scores between the kindergarten and first-grade levels. In geometry, however, O.P.'s score went from 176 to 186, with an increase of 10.0, which

meant that while his score started at the second-grade level, it dropped to between the first- and second-grade levels over the course of the year.  Throughout third grade, O.P. received weekly private math tutoring at his parents' expense.

From April to June 2016, O.P. underwent a series of tests as part of an independent neuropsychological evaluation conducted by Dr. Patricia Gates Ulanet, a developmental neuropsychologist.  As to general cognitive ability, Dr. Ulanet administered the Wechsler Intelligence Test for Children, Fifth Edition ("WISC-V") IQ test.  O.P.'s overall score placed him in the Average range.  On math skills in particular, she administered the Wechsler Individual Achievement Test – III ("WIAT-III") Math Problem Solving test, on which O.P. scored in the 10th percentile, placing him at a 2.2 grade level.  On the WISC-V Arithmetic test, which Dr. Ulanet also administered, O.P. scored in the 16th percentile.  Due to anxiety and dysregulation problems, O.P. was unable to complete a third test, the WIAT-III Numerical Operations test.  Although O.P. scored below grade level on the math tests,  Dr. Ulanet believed that based on O.P.'s cognitive ability, he had the potential to learn at grade level.

While O.P.'s standardized test results placed him at no higher than a second-grade level in math, at the end of third grade, O.P. had earned a mix of Ps and Is on his formative "exit card" assessments, corresponding to "proficient" and "in process," and received Ns, corresponding to "not yet" proficient, or not proficient, only "very rarely[.]" J.R. 43.  According to Kashatus, these grades reflected that, with support, O.P. was performing at grade level in math.  In Kashatus's opinion, O.P. also benefited from instruction in a classroom with his peers, who helped him develop his understanding of the relevant math language and his socialization skills.  According to Brenda Browne, an MCPS Instructional Specialist, the discrepancy between the grade level of O.P.'s math skills as reflected in his test scores and Kashatus's assessment that his math skills

4

were at grade level could be accounted for by O.P.'s test anxiety. This assessment was somewhat contradicted by Dr. Ulanet, who testified that the time constraints of standardized tests were not necessarily anxiety provoking for O.P.; rather, what caused him to become dysregulated was being confronted with something he did not understand.

## II.    Procedural History

On September 22, 2016, following O.P.'s completion of third grade, Plotkin filed a due process complaint on behalf of O.P. with Maryland's Office of Administrative Hearings. In his due process complaint, Plotkin claimed that MCPS had denied O.P. a free appropriate public education ("FAPE") in violation of the IDEA by failing to provide "special education instruction in math, in a separate special education classroom from May 5, 2015 to May 5, 2016 as required by the [IEP.]" J.R. 347. As a remedy, Plotkin sought 270 hours of compensatory outside math tutoring services and reimbursement for neuropsychological testing.

Following the filing of Plotkin's due process complaint, an administrative hearing was held over the course of two days from November 2, 2016 to November 3, 2016 before Administrative Law Judge Lorraine E. Fraser ("the ALJ"). The ALJ admitted a total of 37 exhibits from both parties. During the hearing, Plotkin presented direct testimony from five witnesses, including: (1) Travis Wiebe, the former Assistant Principal of Wood Acres; (2) Patrick Scott, the former Principal Intern at Wood Acres; (3) Catherine Kashatus, O.P's third grade teacher at Wood Acres, who was accepted as an expert in elementary school instruction; (4) Dr. Patricia Gates Ulanet, who was accepted as an expert in developmental neuropsychology with a specialization in autism; and (5) Rori Brown, O.P.'s special education case manager at Wood Acres, who was accepted as an expert in special education. MCPS presented testimony from three witnesses, consisting of: (1)

Kashatus; (2) Brown; and (3) Brenda Browne, an MCPS Instructional Specialist, who was accepted as an expert in special education with an emphasis in instructional math and reading.

In a 20-page opinion issued on November 10, 2016, the ALJ found that O.P. had made academic progress and had received "some educational benefit" from the instruction he had received in third grade and thus concluded that despite the failure of MCPS to provide the pull-out instruction specified in O.P.'s IEP, O.P. had received a FAPE. J.R. 20. The ALJ rendered this decision pursuant to the standard articulated in *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982), in which the United States Supreme Court equated a FAPE to an education "sufficient to confer some educational benefit[.]" *Id.* at 200.

In response to the ALJ's decision, Plotkin filed suit in this Court on February 27, 2017, again asserting that MCPS violated the IDEA by failing to provide O.P. with special education math instruction required by his IEP. Shortly after the filing of the Complaint, however, the Supreme Court decided *Endrew F. ex rel. Joseph F. v. Douglas County School District*, 137 S. Ct. 988 (2017), in which it revised the definition of FAPE to the more demanding standard of an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 1001. Because the ALJ's initial determination was made without the benefit of the Supreme Court's guidance in *Endrew F.*, this Court denied dispositive motions filed by both sides, remanded the case to the ALJ to reweigh the evidence under the *Endrew F.* standard, and stayed the present case. In its remand order, the Court advised that the ALJ should evaluate the impact of various pieces of evidence on the overall assessment of O.P.'s progress and account for O.P.'s topic-specific performance on the MAP test. The Court further advised that the ALJ should account for Plotkin's testimony that, while in the third grade, O.P. received weekly private tutoring in math and consider what the evidence shows about the impact

6

that the tutoring may have had on O.P.'s progress that would not be attributable to his in-school instruction. Finally, the Court requested an explanation of why the ALJ chose to credit certain witnesses and not others and to address how she reconciled Dr. Ulanet's assertion that O.P. has the cognitive ability to perform at grade level in math with O.P.'s test results and the testimony of his MCPS teachers.

On January 15, 2021, the ALJ issued the Decision on Remand, again finding that MCPS had provided O.P. with a FAPE and declining to award compensatory services in math or reimbursement for his neuropsychological evaluation. In particular, the ALJ credited testimony that O.P. exhibited anxiety during testing and found that such anxiety "would cause him to not demonstrate his full capabilities on tests" such that "the truer measure of [his] abilities in math was his actual performance on third grade level work in the classroom." Decision on Remand at 25, ECF No. 67-2. Where Kashatus and Brown had observed him in class while Plaintiff's expert, Dr. Ulanet, based her opinion of O.P.'s ability in math on his testing performance alone, the ALJ found the testimony of Kashatus and Brown to be "more credible and more compelling as to [O.P.'s] performance in math on the third grade level." *Id.* For the same reasons, the ALJ found that O.P.'s topic-specific performance on the MAP test was "not a full measure of the [his] abilities in math." *Id.* The ALJ characterized MCPS's deviation from O.P.'s IEP as an "error" but concluded that where O.P. had nevertheless "made progress in third grade math appropriate to his circumstances" without pull-out instruction, he had received a FAPE as required by the IDEA. *Id.* at 22-23, 26.

Plotkin again seeks review of the ALJ's denial of his due process complaint and appeals the ALJ's Decision on Remand pursuant to 20 U.S.C. § 1415(i)(2).

## DISCUSSION

In the pending cross Motions for Judgment on the Administrative Record, the parties both seek judgment in their favor. Plotkin argues that "[b]y failing to implement portions of the IEP, MCPS changed the I[E]P without notifying the parents in advance," and that this failure constitutes "[a] violation of the IDEA's procedural requirements" that entitles him to relief "even if it cannot be directly established that O.P. was deprived of educational benefits or a [FAPE]." Pl.'s Mot. at 16-17, ECF No. 67. Plotkin therefore claims that the ALJ erred by failing to hold MCPS in violation of the IDEA for its failure to provide pull-out instruction in math during third grade, and he disputes the ALJ's conclusion that O.P. made progress appropriate to his circumstances during the relevant time period. For its part, MCPS acknowledges that it deviated from O.P.'s IEP by providing him only with supported math instruction in a general education classroom, without pull-out instruction. Nevertheless, MCPS argues that the ALJ's decision should be affirmed because the math instruction O.P. received in the general education classroom was provided in the least restrictive environment and was reasonably calculated to enable him to make appropriate progress in light of his circumstances, such that any procedural violation of the IDEA did not deny O.P. access to a FAPE.

## I.    Legal Standard

The IDEA "provides funds for states to educate children with disabilities, subject to conditions imposing substantive requirements on the education that is provided." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 241 (4th Cir. 2019). Specifically, it requires that recipient states provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). A FAPE includes "special education," consisting of "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability," and "related services . . . as may be required to assist a

child with a disability to benefit from special education[.]" *Id.* §§ 1401(9), 1401(26), 1401(29). Under the IDEA, children receiving special education must be educated in the "least restrictive environment . . . with children who are not disabled" to "the maximum extent appropriate[.]" *Id.* § 1412(a)(5).

Parents seeking to enforce their children's rights under the IDEA must begin by filing a due process complaint. *See* 20 U.S.C. §§ 1415(b)(6), (f). The relevant state or local educational agency must then hold an "impartial due process hearing" addressing the claims. *Id.* § 1415(f). At the conclusion of the administrative process, the parents may assert the same rights asserted in the due process complaint in a civil action in either state court or federal district court. *Id.* § 1415(i)(2). A district court reviewing a decision of the educational agency "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

In reviewing the decision of the ALJ in an IDEA case, a district court must apply a "modified de novo review, 'giving due weight to the underlying administrative proceedings.'" *R.F.*, 919 F.3d at 244-45 (quoting *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 323 (4th Cir. 2009)); *see also Rowley*, 458 U.S. at 206. In the evaluation of the administrative record, findings of fact which are "made in a regular manner and with evidentiary support" are considered "*prima facie*" correct, and a reviewing court that does not adhere to the factual findings must explain its deviation. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). To determine whether an ALJ's findings were "regularly made," a district court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Id.*; *see J.P. ex rel. Peterson v. Cnty Sch. Bd. of Hanover Cnty.*, 516

9

F.3d 254, 259 (4th Cir. 2008) ("When determining whether a hearing officer's findings were regularly made, our cases have typically focused on the *process* through which the findings were made."). Findings of fact are not "regularly made" and are therefore "entitled to no weight" if an administrative officer departs "so far from the accepted norm of a fact-finding process designed to discover truth[.]" *Doyle*, 953 F.2d at 104. Even if the district court determines that an ALJ's regularly made findings of fact are entitled to deference, the district court must make "an independent decision based on its view of the preponderance of the evidence" and decide "whether the state has complied with the IDEA[.]" *Sumter Cnty. Sch. Dist. 17 v. Heffernan*, 642 F.3d 478, 484 (4th Cir. 2011); *see* 20 U.S.C. § 1415(i)(2)(C)(iii). In making this independent decision, "courts should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *R.F.*, 919 F.3d at 245 (quoting *Rowley*, 458 U.S. at 206). The party challenging the administrative decision bears the burden of proof to establish an IDEA violation. *Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991).

Here, the ALJ heard two days of testimony from six witnesses on direct and cross examination, admitted 37 exhibits, and issued two opinions detailing her factual findings and conclusions of law. On the basis of this record, the Court concludes that the ALJ's factual findings were "made in a regular manner[.]" *Doyle*, 953 F.2d at 105; *see also Sch. Bd. of the City of Suffolk v. Rose*, 133 F. Supp. 3d 803, 821 (E.D. Va. 2015) (finding that the hearing officer's findings of fact were entitled to due weight where the hearing officer "heard evidence from witnesses on direct, cross, and re-direct examination; admitted documentary evidence; ruled on objections; . . . and rendered a written final decision"). As discussed below, the ALJ's factual findings are also supported by the evidence and are therefore presumed to be *prima facie* correct. *See Doyle*, 953 F.2d at 105.

## II.    Pull-Out Instruction

Plotkin argues that MCPS violated the IDEA during O.P.'s third grade year by failing to provide O.P. with the 3.5 hours of weekly pullout math instruction specified in his IEP, while MCPS argues that this deviation constitutes only a procedural violation of the IDEA, which must actually interfere with the provision of a FAPE in order for Plotkin to obtain relief. Where O.P. made progress in math during this time period, MCPS argues that he received a FAPE as required by the statute.

The determination of whether a state has violated the IDEA has procedural and substantive components. "Procedurally, the state must comply with the stated requirements of the IDEA. Substantively, the state must offer the child a FAPE, which requires a targeted educational program setting reasonably calculated goals for a child's progress in light of the child's particular circumstances." *R.F.*, 919 F.3d at 245 (internal citation omitted).

### A.    Procedural Violation

To ensure delivery of a FAPE, the IDEA requires a school district to provide an appropriate IEP for each child determined to have a disability requiring special education and related services. *See* 20 U.S.C. §§ 1412(a)(4), 1414(d)(1)(A). Under the IDEA, a school must ensure that a child's IEP team "revises the IEP as appropriate to address . . . the child's anticipated needs . . . or other matters." 20 U.S.C. § 1414(d)(4)(A). However, a school must follow certain procedures before changing a child's placement as identified in the IEP, including providing written prior notice to the child's parents before the local education agency changes a child's educational placement. *See* 20 U.S.C. §§ 1415(b)(3), (c)(1). The United States Court of Appeals for the Fourth Circuit has held that deviation from a student's IEP without such notice constitutes a procedural violation of the IDEA. *See, e.g., R.F.*, 919 F.3d at 247-48 (holding that a school's change to the number of

11

hours of pull-out instruction specified in an IEP without notifying the student's parents "constitutes a procedural violation"). Here, as in *R.F.*, the record supports the finding that MCPS deviated from the IEP by changing the number of hours of pull-out instruction provided to O.P. between May 5, 2015 and May 5, 2016. Where MCPS concedes that O.P.'s parents were not notified of the change, as required by 20 U.S.C. § 1415(b)(3), until December 2015, and Plotkin testified that he was not informed until March 2016, MCPS's failure to implement the pull-out instruction portions of O.P.'s IEP constitutes a procedural violation of the IDEA.

**B.    Substantive Violation**

Plotkin argues that MCPS's failure to adhere strictly to O.P.'s IEP by itself constitutes a violation of the IDEA entitling him to relief, regardless of the educational impact. Plotkin relies on *Van Duyn v. Baker School District 5J*, 502 F.3d 811 (9th Cir. 2007), in which the United States Court of Appeals for the Ninth Circuit held that a "material failure to implement an IEP violates the IDEA" and defined a "material failure" as occurring when "there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id.* at 822. This standard "does not require that the child suffer demonstrable educational harm in order to prevail." *Id.* In the Fourth Circuit, however, a procedural violation of the IDEA does not entitle a plaintiff to the type of compensatory relief sought by Plotkin unless it "actually interfere[s] with the provision of a FAPE." *See T.B. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018). As the court held in *T.B.*:

> A procedural violation of the IDEA may not serve as the basis for recovery unless it resulted in the loss of an educational opportunity for the disabled child. A mere technical contravention of the IDEA that did not actually interfere with the provision of a FAPE is not enough. Rather, the procedural violation must have caused substantive harm. Specifically, the prospect of recovery for a procedural violation of the IDEA depends on whether the student's disability resulted in the loss of a FAPE. Thus, this court has held procedural violations to be harmless

12

where the student nonetheless received an IEP and achieved reasonable educational progress.

*Id.* at 573 (internal citations omitted).

The Fourth Circuit reiterated this principle in *R.F.*, in which it stated that "[u]nless an ALJ determines that a given procedural violation denied the child a FAPE, she may only order compliance with the IDEA's procedural requirements and cannot grant other forms of relief, such as . . . compensatory education." *R.F.*, 919 F.3d at 248. In *R.F.*, the parents of a student with severe autism argued that the school district violated the IDEA by providing the student with more instruction hours in a segregated intensive communication support classroom ("ICSC"), and fewer hours in a general education setting, than specified in her IEP. *See id.* at 242, 247-48. Although R.F.'s IEP called for 14 hours and 35 minutes of general education classroom instruction per week, *id.* at 242, her special education teacher later "determined that she would make more progress" by spending more time in the ICSC and adjusted her ICSC hours accordingly. *Id.* at 248. Notably, R.F. was the only student in the ICSC during much of this time, and the plaintiffs argued that the increased pull-out instruction thus also violated the least restrictive environment requirement of the IDEA. *See id.* at 246-47; 20 U.S.C. § 1412(a)(5). Nevertheless, the Fourth Circuit held that the deviation from R.F.'s IEP did not amount to a substantive violation of the IDEA because the "decision to provide R.F. with more instruction in the ICSC than her IEP specified was 'reasonably calculated to enable [R.F.] to make progress appropriate in light of [her] circumstances.'" *R.F.*, 919 F.3d at 248 (quoting *Endrew F.*, 137 S. Ct. at 999)). The Court must apply the standards set forth in *T.B.* and *R.F.*, which are controlling authority, rather than the standard set forth in *Van Duyn*, which is not.

Under *R.F.*, the determination of whether a procedural violation entitles a plaintiff to compensatory relief consists of an assessment of whether the school's deviation from the IEP

resulted in a violation of the substantive requirements of the IDEA, specifically, a denial of a FAPE under the standard set forth in *Endrew F.* Under *Endrew F.*, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. For example, for a child fully integrated into the regular classroom, an IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* Ensuring that an IEP is "reasonably calculated" to meet a student's needs "requires a prospective judgment by school officials," and "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* "[W]hether or not a program is appropriate is a matter of fact." *Doyle*, 953 F.2d at 105. The IDEA "requires great deference to the views of the school system rather than those of even the most well-meaning parent." *A.B v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004).

The IDEA also requires that a student with an IEP be placed in the least restrictive, appropriate environment:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); *see DeVries v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989) (stating that "[m]ainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with non-handicapped children is not only a laudable goal but is also a requirement of the Act"); *M.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 526 (4th Cir. 2002) (holding that special education services "must be provided to a disabled child in the least restrictive and appropriate environment, with the child participating, to

14

the extent possible, in the same activities as non-disabled children"). The Court therefore must consider whether the failure to provide the pull-out math instruction resulted in the denial of a FAPE to O.P.

Based on its findings of fact, the ALJ concluded that although MCPS deviated from the IEP by failing to provide pull-out math instruction to supplement O.P.'s instruction in a general education classroom with paraeducator support, it still met its substantive obligation to provide O.P. with a FAPE. The ALJ reached this conclusion based on the observations and analysis of the MCPS teachers and educational experts relating to O.P.'s classroom performance, O.P.'s grades, and O.P.'s test results.

### 1.    Classroom Performance

The ALJ's finding that O.P. did in fact receive educational benefit that enabled him to make appropriate progress in math during third grade was based in significant part on the testimony of the MCPS educators who had firsthand observations of his development during the 2015-2016 school year. Rori Brown, O.P.'s third grade special education case manager and an expert in special education, testified that she had decided that even though Wood Acres had the ability to conduct the pull-out instruction sessions, it would be better for O.P. to instead receive small group math instruction within Kashatus's general education classroom. Brown reached this conclusion after receiving input from other IEP team members, who informed her that O.P was "progressing well" and "didn't require additional reteaching aside from what reteaching was already given to him in the [general education] classroom setting." J.R. 70. Brown further testified that based on her personal observations of O.P.'s class, O.P. "was doing quite well in the current [general classroom] setting," which was both "best . . . and . . . very appropriate for him" due to the fact that "Kashatus has great classroom management skills" and "worked with [O.P.] daily in small

15

group" alongside "a one-on-one paraeducator." J.R. 64.  Moreover, Kashatus testified that it was "more difficult sometimes" for O.P. to transition between the general education classroom and the special education classroom where he received pull-out instruction because "he would leave during science or social studies, and we always did group activities and he enjoyed being part of our class during that time," thus demonstrating an educational cost associated with removing O.P. from the classroom for pull-out instruction that could be avoided if such instruction was not necessary for O.P to make progress. J.R. 46.  In light of this evidence, Brown concluded that supported math instruction in a general education classroom "was the perfect setting" for O.P. J.R. 64.  Thus, the decision to forgo the pull-out instruction was a conscious decision made by MCPS based on an individualized assessment of O.P.'s performance and the benefits he would receive in Kashatus's general education classroom.

As for O.P.'s performance in this setting, Kashatus testified that O.P. "receiv[ed] instruction on grade level" and "did perform on grade level in many of the assessments" he received during third grade. J.R. 36.  She also testified that he "absolutely" benefited from being in a general education classroom because he was "exposed to the reasoning language that the other students were using" in her general education classroom, which "helped to give him the math language that he needed to use," and that O.P. "really benefited from that in the main classroom, as opposed to a pull-out classroom because there were many strong students who consistently modeled that kind of language through discussion." J.R. 42.  Plotkin's expert witness, Dr. Ulanet, agreed that O.P. benefited from positive role modeling by the other students in Kashatus's classroom.  As Kashatus testified, the math instruction within her classroom also advanced O.P.'s separate "Social Skills" IEP goal of "maintain[ing] appropriate interactions with peers." J.R. 42, 218.

Similarly, Brenda Browne, the MCPS instructional specialist and special education expert, testified that by the end of third grade, O.P.'s "overall mathematics grade was proficient" and that he was "found to be proficient overall in third-grade math." J.R. 138. Kashatus confirmed that O.P. had earned a mix of Ps and Is on his formative assessment "exit cards," corresponding to "proficient" and "in process," and received Ns, corresponding to "not yet" proficient, only "very rarely[.]" J.R. 43. More specifically, Kashatus also testified that O.P. made progress on the math goals of his IEP, achieving objectives 1, 2, and 3, and making progress toward objective 4 by solving word problems on his own occasionally and at other times with support. Thus, the testimony by the MCPS educators, including O.P.'s own teacher, supports the conclusion that MCPS's decision to focus O.P.'s math instruction within the general education classroom was "reasonably calculated" to enable him to "achieve passing marks and advance from grade to grade" as required by the IDEA. *Endrew F.*, 137 S. Ct. at 999. Where courts are not to "substitute their own notions of sound educational policy for those of the school authorities which they review" in light of the "expertise and the exercise of judgment by school authorities," the Court credits the determinations made by the MCPS educators. *Id.* at 1001; *see also Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004) (noting that "this court owes generous deference (as did the ALJ) to the educators on [the] IEP Team").

In opposing this conclusion, Plotkin relies on the testimony of his expert witness, Dr. Ulanet, who asserted the opinion that O.P. needed both the general education classroom instruction and the separate pull-out instruction in math. J.R. 61. However, in the Decision on Remand, the ALJ specifically stated that she found the testimony of Kashatus and Brown to be "more credible and more compelling as to [O.P.'s] performance in math on the third grade level" because they had observed O.P.'s classroom performance while Dr. Ulanet based her opinion of O.P.'s

performance in math on only the test results. Decision on Remand at 25. Indeed, in her hearing testimony, Dr. Ulanet admitted that she never actually observed O.P. during math instruction in Kashatus's class and "was not aware" that O.P. was receiving one-on-one paraeducator support for math throughout the school day. J.R. 60. Likewise, Brown testified that Dr. Ulanet had observed O.P. in the general education classroom setting for only "approximately ten minutes" while students "were getting back from reading, transitioning to lunch and recess." J.R. 112. Where the ALJ's findings relating to Dr. Ulanet's testimony were "made in a regular manner and with evidentiary support," the Court will credit the ALJ's credibility determinations on this issue and likewise accepts the MCPS experts' opinions as more credible because they are based on extensive observations of O.P. as well as test results. *Doyle*, 953 F.2d at 105; *Wagner*, 340 F. Supp. 2d at 611 (stating that "in according due weight to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses").

Notably, the actual educational environment provided to O.P. had many of the characteristics recommended by Dr. Ulanet. Dr. Ulanet testified that for O.P. to make appropriate progress in math, "a small group of 6 to 8 would be appropriate if the environment is managed and calm and quiet," and he should have "regular follow-up episodes of one-to-one support." J.R. 61. Here, the math instruction provided to O.P. in Kashatus's classroom included "daily . . . small group" instruction in groups "as small as two or three, but . . . never larger than six"; a "one-on-one paraeducator" to support him, particularly during times when was supposed to work at his seat; and an environment that was "very quiet" and "not loud and chaotic . . . at all." J.R. 39, 64, 112. Under these circumstances, The Court does not find that Dr. Ulanet's opinions warrant a determination that the pull-out instruction was necessary to provide O.P. with a FAPE.

## 2.    Standardized Tests

Although Plotkin has argued that O.P.'s MAP standardized test results demonstrate a lack of appropriate progress, and even "showed regression in overall mathematics performance," see Pl.'s Reply at 8, ECF No. 69, a review of those results reveals evidence that is consistent with the ALJ's conclusion. O.P.'s results on the MAP tests show substantial overall gains in math proficiency during the 2015-2016 school year, with his overall Rausch Unit ("RIT") score rising from 169 in Fall 2015 to 183 in Spring 2016, for a total of 14 points of growth during his time in Kashatus's class. *See* J.R. 300. Significantly, this 14-point increase was higher than the average of 13 points of growth for a child in third grade. *Compare* J.R. 300 *with* J.R. 305. Likewise, the data shows that while O.P.'s MAP score at the beginning of the school year placed him in the 5th percentile, by the end of the year he had risen to the 11th percentile. Thus, as both Kashatus and Browne testified, O.P.'s standardized test scores showed progress in math. Even Dr. Ulanet conceded that "[O.P.] made progress based on the Common Core principles that were assessed on the MAP, and those were based on curriculum." J.R. 54.

In attempting to demonstrate an overall regression in math proficiency during third grade, Plotkin compares O.P.'s MAP scores from the end of second grade in Spring 2015 to his MAP results from the end of third grade in Spring 2016, which does not account for learning loss over the summer that cannot be fairly attributed to MCPS's instruction in third grade. Notably, while the record contains "student growth norms" for Fall 2015 to Spring 2016 MAP test performance, thereby allowing the Court to compare O.P.'s school-year growth to that of his peers, it lacks comparable data to permit a comparison of O.P.'s performance from the end of second grade to the end of third grade. *See* J.R. 305. Regardless, even when compared to his test scores in Spring 2015, at the end of second grade, O.P.'s test scores increased in every category.

Plotkin correctly notes that at the end of second grade, O.P.'s test scores corresponded to proficiency somewhere between first- and second-grade levels but closer to the second-grade level, but at the end of third grade, even with the passage of a full school year, O.P.'s test scores corresponded to the same "Grade 1/2" level, but closer to the first-grade level. J.R. 300. The ALJ, however, crediting the testimony of Kashatus and Browne, concluded that O.P. suffered from text anxiety that "would cause him to not demonstrate his full capabilities on tests" such that "the truer measure of [his] abilities in math was his actual performance on third grade level work in the classroom." Decision on Remand at 24-25.

In particular, Browne testified that based on O.P.'s in-class performance, she believed that O.P. was actually performing at a higher level than reflected by the tests results, and that the lower test scores were in part the result of O.P.'s anxiety with taking tests. Although Dr. Ulanet testified that the time constraints of standardized tests were not necessarily anxiety provoking for O.P. and that what caused him to become dysregulated was being confronted with something he did not understand, the ALJ generally credited the testimony of the MCPS experts over that of Dr. Ulanet. Moreover, Dr. Ulanet also acknowledged O.P.'s test anxiety when she stated that "[O.P.] became more anxious and more dysregulated" over the course of a "one-on-one testing situation," J.R. 50, and noted in her report that O.P. was unable to complete the WIAT-III Numerical Operations test due to his anxiety and dysregulation during the testing session. J.R. 323.

Where O.P.'s test results show that he progressed at a faster than average rate in math during his time in Kashatus's class, and the evidence supports the conclusion that test anxiety prevented O.P.'s test results from fully reflecting his progress in math, the Court finds that the test results are consistent with the conclusion that O.P. made progress appropriate to his circumstances during third grade even without the pull-out instruction.

### 3.  Private Tutoring

Lastly, Plotkin argues that the ALJ "failed . . . to explain" Browne's testimony that "it was impossible to know" whether O.P.'s math improvement during third grade was "a result of after school mathematics tutoring . . . or third grade mathematics instruction in the general education classroom by his teacher Ms. Kashatus." Pl.'s Mot. at 22.  Arguably, if O.P.'s progress was the result of the private tutoring arranged by his parents, MCPS's instruction may have been insufficient to provide him with a FAPE.  However, as the party challenging the administrative decision, Plotkin, not MCPS, bears the burden of proof to establish an IDEA violation.  *See Barnett*, 927 F.2d at 152.  As the ALJ stated in the Decision on Remand, no educator or other witness identified what impact the tutoring may have had on O.P.'s progress, and Browne specifically testified that it was not possible to determine what portion of O.P.'s progress was due to tutoring alone.  At the same time, Kashatus, Brown, and Browne testified about how the classroom instruction contributed to his academic progress in math.  On this record, Plotkin has not shown that tutoring, rather than classroom education, was responsible for O.P.'s progress in math during the period in question.

### 4.  FAPE

By failing to follow the IDEA's procedures when changing the number of hours of pull-out instruction provided to O.P., MCPS committed a procedural violation of the statute. *See supra* part II.A.  However, for Plotkin to receive compensatory relief, that violation must have resulted in the denial of a FAPE to O.P. *See R.F.*, 919 F.3d at 248.  Notably, the IDEA does not require an "ideal" education but only one that, based on "a prospective judgment by school officials," is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.  It does "not 'guarantee any particular level of

education'" nor "promise 'any particular [educational] outcome.'" *Id.* at 998 (quoting *Rowley*, 458 U.S. at 192). The IDEA also requires that a student be educated in the least restrictive environment. *See* 20 U.S.C. § 1412(a)(5)(A); *M.M.*, 303 F.3d at 526.

Under these standards and on this record, the Court concludes that MCPS's decision to deviate from O.P.'s IEP by not providing the pull-out math instruction did not cause O.P. to be deprived of a FAPE. In particular, the Court relies on the testimony of Kashatus, Brown, and Brown, specifically credited by the ALJ over that of Dr. Ulanet, that the math instruction provided in a general education classroom with paraeducator support met O.P.'s needs and allowed O.P. to make appropriate progress to the point that he was learning at grade level at the end of third grade, and that his test anxiety may have negatively influenced his standardized test results. The Court also relies on the fact that the test results themselves showed academic progress during the course of third grade comparable to if not greater than that of the average student. Accordingly, where MCPS's procedural violation of the IDEA did not substantively deny O.P. a FAPE, the Court will affirm the decision of the ALJ. *See R.F.*, 919 F.3d at 247-48.

## CONCLUSION

For the foregoing reasons, Plotkin's Motion for Judgment on the Administrative Record, ECF No. 67, will be DENIED, and MCPS's Cross Motion for Judgment on the Administrative Record, ECF No. 68, will be GRANTED. A separate Order shall issue.

Date:  September 15, 2022

THEODORE D. CHUANG
United States District Judge